1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10
11   KOHEN DIALLO UHURU,                    Case No. 2:19-cv-10449-JVS-KES
12              Plaintiff,
13        v.                               REPORT AND RECOMMENDATION
                                           OF U.S. MAGISTRATE JUDGE
14   JIM BONNIFIELD, et al.,
15              Defendants.
16
17
18        This Report and Recommendation ("R&R") is submitted to the Honorable

19   James V. Selna, United States District Judge, pursuant to the provisions of 28

20   U.S.C. § 636 and General Order 05-07 of the United States District Court for the

21   Central District of California.

22                                    **I.**

23                              **INTRODUCTION**

24        Kohen Diallo Uhuru ("Plaintiff"), a prisoner in the custody of the California

25   Department of Corrections and Rehabilitation ("CDCR"), filed this civil rights

26   action against CDCR staff members at the California Men's Colony in San Luis

27   Obispo ("CMC") over events that occurred in 2017 and 2018.  He is also suing the

28

                                      1

1   Secretary of the CDCR for injunctive relief.  Plaintiff is currently housed at the

2   California Health Care Facility in Stockton ("CHCF").

3        Plaintiff alleges that Defendants violated his civil rights by interfering with

4   his practice of his Nubian Hebrew Israelite ("NHI") religion, including by denying

5   NHI adherents permission to hold banquets, observe fast days, and conduct group

6   worship; forcing him to work on the NHI Sabbath day; and confiscating or

7   damaging his religious property.  He also claims Defendants retaliated against him

8   for filing grievances challenging these restrictions and discriminated against him

9   based on his disabilities.

10       This R&R recommends dismissing some of Plaintiff's claims without leave

11  to amend for failure to state a claim but  allowing others to proceed.  Section II

12  describes the procedural history of this action and the prior opportunities Plaintiff

13  has had to amend his claims.  Section III summarizes the factual allegations and

14  legal claims in the SAC.  Section IV discusses each of Plaintiff's claims and

15  recommends which claims should be allowed to proceed against which Defendants.

**II.**

**PROCEDURAL HISTORY**

18       The Court screened the initial Complaint under the Prison Litigation Reform

19  Act ("PLRA") and dismissed it with leave to amend.  (Dkt. 10.)  See 28 U.S.C.

20  § 1915A(a)-(b) (PLRA provision requiring courts to screen "any complaint in a

21  civil action in which a prisoner seeks redress from a governmental entity or officer

22  or employee of a governmental entity" and dismiss any claims that are "frivolous,

23  malicious, or fail[] to state a claim upon which relief may be granted").

24       Plaintiff filed a First Amended Complaint.  ("FAC" at Dkt. 20.)  The

25  Magistrate Judge issued an R&R again recommending that some claims be

26  dismissed without leave to amend and some claims be dismissed with leave to

27  amend.  (Dkt. 24.)  After Plaintiff filed objections containing new factual

28  allegations (Dkt. 26), the Magistrate Judge issued a Final R&R discussing the

Objections and again recommending dismissal of some claims with leave to amend and some without leave to amend (Dkt. 30).  The District Judge adopted the Final R&R and granted Plaintiff leave to amend the following claims:

    (a)   ADA discrimination claims against Defendants Farao, Reynoso, and Gomez;

    (b)   Free Exercise and RLUIPA claims based on denial of permission to hold NHI religious banquets;

    (c)   Free Exercise and RLUIPA claims based on loss and/or damage to Plaintiff's Torah, keter, Star of David necklace, hot pot, JWIN music player, and guitar;

    (d)   Free Exercise and RLUIPA claims based on the confiscation of musical instruments in July 2018;

    (e)   Free Exercise and RLUIPA claims based on the work assignment that required Plaintiff to work on the NHI Sabbath,

    (f)   Free Exercise and RLUIPA claims based on access to CMC facilities for NHI group worship;

    (g)   Fourteenth Amendment Equal Protection claim based on discrimination against NHI adherents at CMC;

    (h)   claims arising from an April 2017 incident when Plaintiff was allegedly sprayed with a fire extinguisher while praying on a transfer bus;

    (i)   claim that Plaintiff was denied access to the San Francisco Bay View periodical for a year; and

    (j)   claims arising from the strip search conducted in connection with his transfer from CMC to CHCF.

The Court limited leave to amend to the events and claims previously described in the FAC and the Objections and listed in the Final R&R, and which occurred before the filing of the initial Complaint in December 2019.  (Dkt. 32.)

### III.

### ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

Plaintiff has now filed the operative Second Amended Complaint ("SAC" at Dkt. 38).

**A.   <u>Defendants</u>**

The Defendants named in the SAC are as follows:

(1) Jim Bonnifield, Community Resource Manager ("CRM") at CMC-East;

(2) Josie Gastelo, Warden of CMC-East;

(3) H. Warren Alderson, Protestant chaplain at CMC-East;

(4) Alderson's unnamed predecessor;

(5) Current CDCR Secretary Kathleen Allison;

(6) Former CDCR Secretary Ralph Diaz;

(7) Patrick Andrew George Moloney, head librarian at CMC-East;

(8) J. Ingwerson, Associate Warden at CMC-East;

(9) D. Samuel, Chief Deputy Warden at CMC-East;

(10) J. Steck, Correctional Captain at CMC-East;

(11) Davidson, Receiving and Reception Correctional Officer ("CO") at CMC-East;

(12) Mark Williams, hospice chaplain at CMC-East;

(14) John Farao, Catholic chaplain and coordinator or sponsor for the "get-on-the-bus" program;

(15) R. Gomez, Custody Case Worker ("CCW") at CMC-East; and

(16) M. Reynoso, Appeals Coordinator at CMC-East.

(SAC at 3-7.)

**B.   <u>Factual Allegations</u>**

**1.     Initial Requests for NHI Group Worship Services**

On May 7, 2017, Defendant Chaplain Alderson "required Plaintiff ... to sign an application for 'Ministry of Music' on Sundays as a prerequisite to establish the

1   [NHI] praise and worship services...."  (SAC at 9 ¶ II.)  This "created a substantial

2   burden to practice Plaintiff's NHI beliefs due to the fact that it was [a] façade run

3   by unqualified inmates conducting so-called ... 'ministry training' in order to

4   participate in any activities within the chapel."  (Id. at 9 ¶ II.)

5           On June 9, 2017, Plaintiff and other NHI adherents applied for permission to

6   hold group worship services in the chapel at CMC on Friday nights from 6:00 p.m.

7   to 7:30 p.m.  (SAC at 9 ¶ IV [referring to request submitted by Sidney Symington

8   "as a volunteer sponsor"].)  This was "denied through omissions and failure to act

9   by Defendants" CRM Bonnifield, Warden Gastelo, and Chaplain Alderson, and

10  "Plaintiff was punished with denials to attend Friday services."  (Id.)

11          However, in late 2017 or early 2018, Defendant CRM Bonnifield (and a

12  Native American chaplain who is not named as a Defendant) "approved by

13  memorandum for chapel services to be implemented commencing on January 4,

14  2018."  (Id. at 9-10 ¶ VIII.)

15          On January 14, 2018, at Defendant Chaplain Alderson's request, Plaintiff

16  "submit[ted] all names of participants signed up for [NHI] Sabbatical (Saturdays)

17  services" and a proposed "NHI curriculum" that Plaintiff entitled, "School of

18  Prophets."  (Id. at 9-10 ¶ VIII.)  When Chaplain Alderson reviewed these materials,

19  he "became very perturbed with malice" and began attempting to "deny[] [NHI

20  adherents] time and space within the chapel...."  (Id. at 9-10 ¶ VIII; see also id. at

21  10 ¶ IX [alleging that on January 16, 2018, Chaplain Alderson was "adamant and

22  defiant ... when additional names for NHI services were submitted"]; id. at 13

23  ¶ XXII [alleging that on May 20, 2018, Chaplain Alderson "made a public denial of

24  the [NHI] scheduled Sunday service with an abrupt cancellation with open

25  contempt and no explanation"].)

26          However, on February 23, 2018, Chaplain Alderson allowed "Muslims to

27  conduct Jumah services...."  (Id. at 10 ¶ IX.)

28

### 2.    Music Performances

As of July 2017, Plaintiff was "endorsed to perform secular music with musical instruments during educational graduation" and other secular events in the gym and mental health building of the prison.  (Id. at 10 ¶ XI; id. at 9 ¶ VII ["Defendants and Plaintiff" had an "agreement [for Plaintiff] to perform [music] professionally in the gym, mental health [building] and in Plaintiff's cell...."].)  On July 19, 2017, at an interview with Defendants Gastelo and Ingwerson, Plaintiff complained that playing secular music "created a substantial burden" on the practice of his religion, because he "receive[d] milestones with good time credits" for playing music at secular events and yet he was not allowed to hold NHI group worship services where he could play religious music.  (Id. at 10 ¶ XI.)

In November 2017 and January 2018, NHI adherents donated a Radio Shack keyboard and an Epiphone Les Paul guitar to Plaintiff "for NHI praise and worship," and Plaintiff was allowed to keep these instruments in his cell.  (Id. at 9 ¶ V [on November 30, 2017 "CMC-East guards in [building] 8[,] second floor called Plaintiff to retrieve and remove the [NHI adherents'] donated Radio Shack keyboard into the cell of Plaintiff on the bottom tier floor which was transported by the [NHI] student John Heckard"]; id. at 9 ¶ VI [on January 1, 2018, "Rudy Johnson as a student participant with the [NHI adherents] donated [a] guitar [to Plaintiff] for NHI praise and worship"].)

In January 2018, Defendant Chaplain Alderson granted Plaintiff permission to keep a Charvel amplifier and the CMC chapel's Yamaha keyboard in his cell so that he could practice.  (Id. at 9 ¶ V-VII; see also FAC at 7 [the memo].)

### 3.    Request for NHI Inmate Leisure Time Activity Group ("ILTAG")

Sometime in 2017, Plaintiff sought permission to have his NHI "School of Prophets" "curriculum" approved as an Inmate Leisure Time Activity Group ("ILTAG").  (Id. at 4 ¶ 3.)   Under CDCR regulations, "Institution heads may permit the formation of [ILTAGs] which promote educational, social, cultural and

recreational interests of participating inmates."  Cal. Code Regs. tit. 15, § 3233.

According to Plaintiff, prisoners participating in ILTAGs can earn time credits that

advance their release date.  (SAC at 4, 10.)

Defendant Associate Warden Ingwerson denied permission for the proposed

ILTAG.  (Id. at 4 ¶ 3.)  On August 2, 2017, Plaintiff "was interviewed by"

Defendant Warden Gastelo "regarding 'Warden's Meeting Agenda' with reference

to Plaintiff's previous[ly] documented didactic musical skills implemented by his

spiritual group 'Shepherd's Praise' and NHI concerts performed at CMC-East on all

yards A, B, C, and D on April 26, 2008 and April 27, 2008 whereby Defendant

personally instructed Plaintiff to submit another M.U.S.I.C. proposal for Inmate

Leisure Time Activity Group (ILTAG)."  (Id. at 10-11 ¶ XII.)

**4.     Continued Request for Group Worship Services**

In 2018, Plaintiff had multiple meetings with CMC personnel unsuccessfully

attempting to gain permission for NHI group worship services in the chapel.  (Id. at

10 ¶ X [February 28, 2018 meeting with Ombudsman Tami Falconer and

Defendants CRM Bonnifield and Warden Gastelo about "Plaintiff's allegations of

Constitutional violations under the 1st and 14th Amend[ments] denying freedom of

religion ... to have time and space in chapel for sabbatical worship or rotational

compromise on Sundays for NHI services"]; id. at 12 ¶ XVII [May 1, 2018

interview with Defendant Chaplain Mark Williams about Plaintiff's request for

NHI "prayer, praise, and worship services within the chapel," which Chaplain

Williams "denied with disdain with no penological purpose"]; id. at 12 ¶ XIX [May

10, 2018 meeting with Defendant Chaplain Farao wherein Plaintiff asked why NHI

adherents were not being given "the same accommodations as other religions such

as [Chaplain Farao's] Catholic faith, Muslim and Christian" faiths and Chaplain

Farao responded that "he was just doing what he was told to do in his rejections"].)

Alternatively, Plaintiff asked for the yard at CMC to be reconfigured in a

way that would allow NHI adherents to hold outdoor services.  (See id. at 15

¶ XXVII [alleging that in or around July 2018, Plaintiff asked Defendant Warden Gastelo "why she was denying the [NHI] adherents time and space in the chapel for worship or the assembly pursuant to yard configurations per DOM requirements as an alternative"; she responded, "Just write us up then"]; see also FAC at 8 ¶ 11 [alleging that Defendant Captain Steck failed to create "yard configurations with designated worship areas" as provided in the Department Operations Manual in "the Facility-D area next to the building 'MA,'" "due to mismanagement and misappropriation of funds"].)

### 5.    Requests for NHI Banquets to Celebrate Passover

In 2018, Plaintiff also unsuccessfully sought permission for NHI adherents to hold a Passover banquet "in the second month."  (Id. at 11 ¶ XIV [April 8, 2018 interview with Defendant Chaplain Alderson]; id. at 11 ¶ XVI [April 20, 2018 meeting with Imam Enrique Rasheed about holding a "banquet with foods of religious significance" and although every criteria was met under the applicable regulations, Defendants Bonnifield, Gastelo, Steck, Alderson and Ingwerson denied the request]; id. at 13 ¶ XX [May 17, 2018 interview with food manager named Ms. Tucker, who said she could not do anything if Defendant Warden Gastelo "continue[d] to deny Plaintiff's religious meal/food requests forms"].)  The SAC alleges that NHI adherents hold Passover ceremonies at a different time of year than Jewish Passover ceremonies.  (See id. at 21 [seeking an order "allow[ing] [Plaintiff] and all participants in the [NHI] religion to avoid punishments for non-observance of [Jewish] Passover" because they "observe[] prison Passovers in the second month"].)

Plaintiff met "every criteria" for holding such a banquet under California Code of Regulations, title 15, section 3053(a)-(b).  (SAC at 11 ¶ XVI.)  That regulation states:

(a) Inmate religious groups shall not be permitted more than two
events each year where foods with religious significance are provided

8

by the institution in place of the regularly planned meal.  These event meals must be approved and sponsored by a Chaplain.  For the purposes of this article, Chaplain means a local Institution Chaplain, or their designee representing the religious group.

(b) A Chaplain shall decide the two religious events when religious meals are provided.  The religious group's request for ceremonial foods shall be directed to the institution head, or designee by the Chaplain at least 30 days, but no more than 90 days before the event, and shall include the following:

(1) Date and location of the event.

(2) Proposed menu.

(3) Number of inmates and/or guests to be served.

(4) Specific ceremonial foods.

Cal. Code Regs. tit. 15, § 3053.   The regulations concerning the Kosher Diet Program: "Observance of [Jewish] Passover constitutes a single religious event, requiring kosher for Passover foods to be provided during the eight days of observance."  Cal. Code Regs. tit. 15, § 3054.2(e).[1]

In or around the same time period, Muslim inmates were allowed to have a "feast" for Eid; Christian inmates were allowed "Communion every month" and "Christmas food celebrations"; and CDCR provided food for "secular events such as 4th of July and Thanksgiving...."  (Id. at 13 ¶ XX.)

---

[1] Although the SAC is unclear on this point, it appears that Plaintiff's NHI religion requires a vegetarian diet rather than a Kosher diet.  See Uhuru v. Moskowitz, No. 07-cv-07109-JVS-VBK, 2009 U.S. Dist. LEXIS 134433 at *29, 2009 WL 2020758 at *12 (C.D. Cal. June 1, 2009), R&R accepted, 2009 U.S. Dist. LEXIS 58089, 2009 WL 2020758 (C.D. Cal. July 6, 2009) (dismissing Plaintiff's religious practice claims based on a different prison's failure to provide him with Kosher meals, finding that he was offered inclusion into the vegetarian program and exhibits to the complaint showed this was consistent with his religion).

### 6. Request for NHI Chaplain or Inmate Ministers

On June 3, 2018, at a "minister's meeting within the CMC-East chapel," CRM Bonnifield, Warden Gastelo, Chaplain Alderson, and Chaplain Williams designated certain inmates as "ministers" under California Code of Regulations, title 15, section 3211(a).  (Id. at 14 ¶ XXIV.)  This regulation states in relevant part:

> When a chaplain of a particular faith cannot be obtained to conduct
> services within a facility housing inmates of that faith, the institution
> head may at their discretion and subject to such controls reasonably
> required for facility security, designate a qualified inmate to minister
> to the religious needs of inmates for that specific faith.  In determining
> the qualifications of an inmate to conduct such services, the institution
> head will, whenever possible, seek the advice and counsel of outside
> religious leaders of that faith.

Cal. Code Regs. tit. 15, § 3211(a).  At the June 3 meeting, Plaintiff objected that none of these inmates "had the credentials" to be designated ministers under this regulation "because they had hirelings and chaplains employed for their faith plus volunteers endorsing various Christian denominations," and he also argued it was not fair that they "were allowed to preach and teach their own doctrines while ... Plaintiff was being ostracized...."  (Id. at 14 ¶ XXIV.)

### 7. Attempt to Have NHI Service (June 2018)

On June 11, 2018, "an attempt was made to have a[n] [NHI] service" and "immediately after entrance in the chapel," Defendants CRM Bonnifield, Warden Gastelo, Chaplain Alderson, and Chaplain Williams "colluded with CMC-East plaza guards to search then pat down all [NHI] participants[,] then abruptly made everyone exit the chapel to discourage further attempts to participate."  (Id. at 14 ¶ XXV.)

### 8.   Confiscation of Musical Instruments at CMC

"After [an] interview with" Plaintiff on August 16, 2018, CRM Bonnifield "displayed and implemented retaliation tactics by telling other inmates Plaintiff's confidential information to incite retribution" and "confiscate[ed] [the NHI adherents'] musical appliances ... because of the Plaintiff's all-out attempts to practice his NHI religion...."  (Id. at 15 ¶ XXX.)

### 9.   More Favorable Treatment of Other Groups

In 2017 and 2018, other religious groups and secular groups were allowed to use CMC-East chapel space for events.  (Id. at 9 ¶ III [on November 17, 2017 Muslim Jumah services held in chapel]; id. at 10 ¶ IX [on February 23, 2018 Muslim Jumah services held in chapel]; id. at 13 ¶ XXIII [on June 2, 2018, Defendants CRM Bonnifield, Warden Gastelo, and Chaplain Alderson, allowed "a secular CGA group in the chapel"]; id. at 14 ¶ XXXVI [on June 30, 2018 outside visitors conducted a "victim awareness" or "restorative justice" program in the chapel]; id. at 15 ¶ XXIX [on August 10, 2018, "John Flemming was approved to promote Yiddish/Jewish Bible study on Friday nights as a requirement for inmates in the Christian choir and music ministry ... while [NHI adherents] are still denied 1st Amend[ment] and 14th Amend[ment], RLUIPA liberty interest rights for freedom to worship"].)

### 10.   Personal Property During Transfer

On January 12, 2019, "during property transfer packing," Defendant CO Davidson "observed and acknowledged Plaintiff's religious property and apparel with religious appliances," i.e., his "holy/legal books or 'scroll' in Hebrew Tenakh," and a "Keter (religious crown and prayer shawl)" which was "hand knitted soft material multicolored religious headgear covering [the] entire head [as] opposed to a Jewish skull cap."  (SAC at 5 ¶ 3.)  Plaintiff also had a sterling silver Star of David necklace and a hot pot.  (Id.)

Plaintiff showed CO Davidson a memorandum granting an administrative appeal filed by Plaintiff, which "approv[ed] the Plaintiff to wear his religious apparel at all times pursuant to" California Code of Regulations, title 15, section 3213(b)-(c).[2] (Id. [citing CMC Appeal Log #E-06-02488].)  While "processing" Plaintiff's "hot pot/Geneva watch/and Walkman CD-AM/FM radio player, the Defendant became hostile" and told Plaintiff "he's not leaving with his religious property nor appliances...."  (Id.)

When Plaintiff arrived at CHCF, he discovered that his music player had been "broken and tampered with," even though it was working before he left CMC. (Id.)  The loss of a working music player "prevent[ed] Plaintiff from listening and performing authentic Hebrew music...."  (Id. at 17 ¶ 1.)

The SAC appears to be alleging that the Star of David necklace, Torah scroll, hot pot, and guitar were never returned to Plaintiff.  (See id. at 21 [prayer for relief asking that these items be "replaced"]; id. at 17-21 [alleging that absence of the hot pot made Plaintiff unable to prepare religious foods]; see also FAC at 9 [alleging that CO Davidson "destroyed Plaintiff's religious and authorize[d] property of classical Hebrew Bible (Torah in scroll form), [and] his hot pot"].)  The SAC also appears to be alleging that Plaintiff's religious headgear was never returned to him. (See Dkt. 30 at 29-30 [prior R&R construing Plaintiff's prior pleadings as alleging this]; Dkt. 26 at 6 ¶ 14 [objections to prior R&R, alleging that CO Davidson "when documenting his CDCR-1083 that his 'holy (Keter) crown' and prayer shawl could not be worn on the CDCR transportation bus, therefore these items were

---

[2] This regulation provides in relevant part: "An inmate may possess any religious item authorized in the Religious Personal Property Matrix (RPPM) (Rev. 6/27/13), which is incorporated by reference in subsection 3190(b).  As defined in the RPPM, and subject to reasonable search by staff, an inmate may wear or carry at any time, the following: beaded headband, beaded wrist band, beaded choker, religious medallion and chain, religious headgear, medicine bag, prayer beads, and tallit katan/tsitsit."  Cal. Code Regs. tit. 15, § 3213(b).

confiscated and destroyed"]; but see SAC at 20-21 [not seeking replacement of the headgear].)

The SAC alleges that Plaintiff filed an administrative appeal seeking the return of or compensation for his confiscated and/or damaged property, and Defendant Appeals Coordinator Reynoso "deni[ed] Plaintiff his approved compensation from prison officials [for] liability regarding Plaintiff's religious property...." (Id. at 7; see also FAC at 18 [alleging that Plaintiff's appeals resulted in a third-level denial dated April 30, 2020 and citing appeal nos. CMC-E-17-01019, CMC-19-02703, and CHCF-19-03736].) "Lt. Eillers was called in by Defendants and not Plaintiff as a witness to justify [the] illegal and involuntary tans pack of Plaintiff's property," which was really "out of reprisal and retaliation for filing appeals on 01/12/2019 to transfer out of CMC-East." (SAC at 16 ¶ XXXII.)

The loss or damage to this property "prevent[ed] Plaintiff from listening [to] and performing authentic Hebrew music" and "denied his hot pot to implement his own foods with religious value and significance...." (Id. at 17.) Defendants CRM Bonnifield, Warden Gastelo, and Chaplain Alderson "were fully aware of Plaintiff's historical case factors that music and foods of religious significance were vital to his mental health therapy and well-being...." (Id. at 20.)

## C.   Claims Raised and Relief Sought

Based on the above factual allegations, the SAC brings claims under RLUIPA, the Free Exercise Clause of the California and U.S. Constitutions, the Equal Protection Clause of the California and U.S. Constitutions, the Eighth Amendment, the California Bane Act, and the California Government Code for breach of contract. The SAC seeks compensatory and punitive damages, as well as specific injunctive relief. (SAC at 21-22.)

# IV.

## DISCUSSION

**A.**   **Claims Outside the Scope of Leave to Amend**

The SAC includes some claims that are outside the scope of leave to amend previously granted.  As discussed above, the Court previously granted Plaintiff leave to amend, limiting him "to the events and claims described in the FAC and Objections [to the prior R&R] and listed, and which occurred before the filing of the initial Complaint in December 2019."  (Dkt. 32 at 2-3.)

**1.**   **Claims Previously Dismissed Without Leave to Amend[3]**

The SAC improperly raises the following claims, which were previously dismissed *without* leave to amend:

- Claims seeking monetary damages from Defendants in their official capacities (SAC at 3-7; Dkt. 30 at 4-7);

- Access to courts claim against CMC librarian Moloney based on reading of Plaintiff's legal mail to courts (SAC at 4, 19; Dkt. 30 at 17-19);

- Free Exercise and RLUIPA claims based on confiscation of or damage to Plaintiff's medical supplies during his transfer from CMC to CHCF (SAC at 5 ¶ 3; Dkt. 30 at 31);

---

[3] The Court notes that it *granted* Plaintiff leave to amend the following claims, which are not mentioned in the SAC: (a) that Defendants Reynoso and Gomez discriminated against him under the ADA by denying grievances (Dkt. 30 at 13-15); (b) that Plaintiff was denied access to the San Francisco Bay View periodical for a year (id. at 43-44); and (c) that Plaintiff was improperly strip-searched in connection with his transfer from CMC to CHCF (id. at 44-46). Plaintiff has therefore voluntarily dismissed these claims.  See Lacey v. Maricopa Cty., 693 F.3d 896, 928 (9th Cir. 2012) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal.  But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.").

- Free Exercise and RLUIPA claims based on Defendant Chaplain Farao kicking Plaintiff out of the chapel in September 2017 and November 2018 (SAC at 6; id. at 11 ¶ XV; id. at 13 ¶ XXI; Dkt. 30 at 25); and

- Free Exercise, RLUIPA, and Eighth Amendment claims based on the failure to assign Plaintiff to a single cell (SAC at 8; id. at 12 ¶ XVIII; id. at 20; Dkt. 30 at 37-38).

These claims should be dismissed again, because they were realleged after a dismissal with prejudice.  See Lacey, 693 F.3d at 928 ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal."); Benamar v. Air France-KLM, No. 15-cv-02444-CAS-JPRx, 2015 U.S. Dist. LEXIS 100660 at *6-7, 2015 WL 4606751 at *3 (C.D. Cal. July 31, 2015) (finding that a majority of district courts "have relied on Lacey in finding it more efficient to dismiss or strike realleged claims already dismissed with prejudice" to avoid "wasting resources 'in parsing old claims and reiterating ... prior rulings'") (citation omitted).

### 2.    New Claims

Additionally, the SAC improperly raises the following *new* claims which are outside the scope of amendment granted:

- ADA claims against Warden Gastelo, Chaplain Alderson, and Chaplain Williams (SAC at 3 ¶¶ 2-3)[4];

---

[4] The ADA claims against Defendants Gastelo, Alderson, and Williams also fail to state a claim because it is not clear why Plaintiff believes they violated his rights under the ADA.  To the extent Plaintiff is claiming that Chaplain Williams was somehow involved in the November 24, 2018 incident where Chaplain Farao kicked Plaintiff out of the chapel, this would fail to state a claim for the same reasons as the ADA claim against Chaplain Farao, discussed below in section IV.C.2.

- ADA claims against Defendants Reynoso and Gomez for denying Plaintiff's request for "unrestricted access to his cell for hygiene purposes" (id. at 7 ¶ 5);
- Claims based on Plaintiff bring ordered to walk upstairs to the dining hall despite having "chronos for low tier/low terrain due to seizures," and based on the lack of "ladders to climb on upper bunks" in Plaintiff's double cell (id. at 7-8, 20);
- Claims alleging that Plaintiff should be given a new "religious diet card with separate picture ID that was confiscated at CMF in Vacaville" (id. at 21);
- Claims alleging that NHI adherents should be provided with "'Ensure drinks' during transfers to avoid violations on non Kashrut [sic] procedures" and that "prison polices make Kosher meal participants go without Kosher during transfers with redundant and unnecessary re-signups" (id. at 21);
- Eighth Amendment claims based on denial of religious practices and damage to or destruction of religious property (id. at 17, 19, 20)[5]; and
- Claims under the California Bane Act; 42 U.S.C. §§ 1985 and 1986; California Government Code sections 844.6(a) and 814; and the California Constitution, article I, sections 1-4, 6-7, and 17.

---

[5] These allegations also fail to state a claim under the Eighth Amendment. See, e.g., Davis v. Flores, No. 08-cv-01197, 2010 U.S. Dist. LEXIS 66691 at *48-49, 2010 WL 2673458 at *16 (E.D. Cal. July 2, 2010) (finding nothing "remotely satisfying the objective element of an Eighth Amendment claim (no wanton infliction of pain, no threat to his health or safety, or any other indecent condition of confinement, singly or in combination) associated with ... an institutional policy restricting ... prisoners' purchase and possession of prayer oil in their cells and inmate gatherings for religious services unless supervised by approved persons defined in the policy"), aff'd, 484 F. App'x 108 (9th Cir. 2012).

1   These claims should be dismissed without prejudice as exceeding the scope

2   of leave to amend.  See, e.g., DeLeon v. Wells Fargo Bank, N.A., No. 10-cv-01390,

3   2010 U.S. Dist. LEXIS 112941 at *9, 2010 WL 4285006 at *3 (N.D. Cal. Oct. 22,

4   2010) (collecting cases holding that "where leave to amend is given to cure

5   deficiencies in certain specified claims, ... new claims alleged for the first time in

6   the amended pleading should be dismissed or stricken").

7   **B.**    **Official Capacity Claims Against CDCR Secretaries**

8       **1.**    **Legal Standard**

9       Official capacity claims against CDCR employees are treated as claims

10   against the CDCR.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978).

11   As a state agency, the CDCR is immune from monetary damages for § 1983 claims

12   under the Eleventh Amendment.  See Will v. Mich. Dep't of State Police, 491 U.S.

13   58, 64-66 (1989); Holley v. Cal. Dep't of Corrs., 599 F.3d 1108, 1111 (9th Cir.

14   2010); Brown v. Cal. Dep't of Corrs., 554 F.3d 747, 752 (9th Cir. 2009).  A claim

15   "for prospective injunctive relief provides a narrow, but well-established exception

16   to Eleventh Amendment immunity."  Flint v. Dennison, 488 F.3d 816, 825 (9th Cir.

17   2007) (citing Ex parte Young, 209 U.S. 123 (1908)).  To fall under this exception,

18   the complaint must "allege[] on ongoing violation of federal law and seek[] relief

19   properly characterized as prospective."  Verizon Md., Inc. v. PSC, 535 U.S. 635,

20   645 (2002) (citation omitted).

21       **2.**    **Dismiss: Claims Against Former CDCR Secretary Diaz**

22       The SAC brings claims against former CDCR Secretary Ralph Diaz and

23   current CDCR Secretary Kathleen Allison in their official capacities only.  (SAC at

24   4 ¶ 1.)  The SAC states that Allison "should be substituted [for Diaz] based on

25   claims of policy and procedure," citing Federal Rule of Civil Procedure 25(d).  (Id.)

26   However, prior versions of the complaint did not name Diaz, Allison, or any other

27   CDCR Secretary as a Defendant.  Rule 25(d) therefore does not apply here.  See

28   Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a

party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").  To the extent the SAC is bringing an official capacity claim against Diaz, such claims should be dismissed because he is no longer the CDCR Secretary.

### 3. Proceed: Claims Against Current CDCR Secretary Allison

Plaintiff may not seek damages against CDCR Secretary Allison in her official capacity, because she is entitled to Eleventh Amendment immunity.  However, the SAC does seek several different types of prospective injunctive relief, including changes to official CDCR regulations and policies.  (See SAC at 21.)  The SAC also alleges that the CDCR failed to adequately train employees after it was made aware of the allegedly unconstitutional conditions described in the SAC.  (Id. at 17.)  See generally Connick v. Thompson, 563 U.S. 51, 61 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' ... Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'") (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989)).  Accordingly, at this early stage of the litigation, the Court will allow the claims for prospective, injunctive relief against current Secretary Allison in her official capacity to proceed.

### C. ADA Discrimination Claims

### 1. Legal Standard

Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the benefit of
> services, programs, or activities of a public entity, or be subjected to
> discrimination by any such entity.

42 U.S.C. § 12132. This provision of the ADA extends to discrimination against inmates in state prison. Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998).

"To prove that a public program or service violated Title II of the ADA, a plaintiff must show that: (1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001).

The ADA defines a disability as: (a) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (b) "a record of such an impairment"; or (c) "being regarded as having such an impairment." 42 U.S.C. § 12102(1); see also Kula v. Malani, 539 F. Supp. 2d 1263, 1267-68 (D. Haw. 2008).

To show that the discrimination was "by reason of" the plaintiff's disability, the plaintiff must show that the action would not have been taken "but for" the disability. See Murray v. Mayo Clinic, 934 F.3d 1101, 1107 (9th Cir. 2019) (holding that "ADA discrimination claims under Title I must be evaluated under a but-for causation standard."), cert. denied, 206 L. Ed. 2d 855 (Apr. 27, 2020).[6]

---

[6] Earlier Ninth Circuit cases holding that Title II ADA discrimination claims should be evaluated under the less strict "motivating factor" standard, see, e.g., K.M. ex rel. Bright v. Tustin Unified Sch. Dist., 725 F.3d 1088, 1099 (9th Cir. 2013), appear to have been overruled by the Supreme Court. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 350 (2013) (explaining that "because of," "by reason of," "on account of," and "based on" all indicate a but-for causal

1    Further, "[t]o recover monetary damages under Title II of the ADA …, a plaintiff
2    must prove *intentional* discrimination on the part of the defendant." Duvall, 260
3    F.3d at 1138 (emphasis added).  This requires the plaintiff to show that the
4    defendant acted with "deliberate indifference," i.e., that the defendant had
5    "knowledge that a harm to a federally protected right is substantially likely, and ...
6    fail[ed] to act upon that the likelihood." Id. at 1139.  The plaintiff must either
7    "alert[] … the public entity to his need for accommodation" or the need must be
8    "obvious, or required by statute or regulation." Id.

9        **2.    Dismissal without Leave to Amend**

10       The SAC brings an ADA discrimination claim against Defendant Chaplain
11   Farao, alleging as follows:

12       On November 24, 2018, Chaplain Farao "maliciously kicked Plaintiff out of
13   the chapel due to his disability of not being able to stand due to foot deformity and
14   hearing impairment while wearing [a] med[ical] vest" that was "bright green" and
15   holding a cane.  (SAC at 6 ¶ 5.)  Plaintiff is disabled within the meaning of the
16   ADA because he has "documented medical disabilities of foot deformity, mobility
17   impairment, hearing impairment, and visual impairment where prescription tinted
18   lens medical eyewear is required to read" and "he has been professionally
19   diagnosed by medical and mental health doctors with conditions that substantially
20   limit[] his life activities." (Id.)  Kicking him out of the chapel was "discrimination
21   by reason of Plaintiff's disability." (Id.)

22       The Court previously dismissed this claim with leave to amend, finding that,
23   although Plaintiff appeared to be alleging that Chaplain Farao kicked him out of the
24   chapel because Plaintiff failed to stand during a religious ceremony, the FAC did

25   _____

26   relationship).  However, the Court need not resolve that issue at this time because
27   the FAC's allegations fail to state a claim under either the "but for" or "motivating
     factor" standard.
28

1    not sufficiently describe the circumstances.  (Dkt. 30 at 11-13.)  The Court also

2    found that, because the FAC did not describe Plaintiff's mobility or hearing

3    impairments in any detail, it failed to show that they qualified as disabilities under

4    the ADA.  (Id.)

5          The allegations in the SAC fail to state a claim for the same reasons.  Even

6    assuming the SAC includes enough facts about Plaintiff's impairments to show that

7    he qualifies as disabled under the ADA, the SAC does not include enough facts

8    about the incident to plausibly allege that Chaplain Farao discriminated against

9    Plaintiff by reason of those disabilities.  Accordingly, this claim should be

10   dismissed.  The dismissal should be without leave to amend, because Plaintiff has

11   already had multiple opportunities to amend this claim.  See Williams v. California,

12   764 F.3d 1002, 1018-19 (9th Cir. 2014) (affirming district court's finding that the

13   "fact that Plaintiffs have already had two chances to articulate clear and lucid

14   theories underlying their claims, and they failed to do so, demonstrates that

15   amendment would be futile").

16   **D.**      **Free Exercise, RLUIPA, and Equal Protection Claims**

17          **1.**      **Legal Standards**

18                 a.      First Amendment Free Exercise Clause Claims Under § 1983

19          "Inmates … retain protections afforded by the First Amendment, …

20   including its directive that no law shall prohibit the free exercise of religion."

21   O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (internal quotations and

22   citation omitted).  "A person asserting a [First Amendment] free exercise claim

23   must show that the government action in question substantially burdens the

24   person's practice of her religion."  Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir.

25   2015).  "A substantial burden ... place[s] more than an inconvenience on religious

26   exercise; it must have a tendency to coerce individuals into acting contrary to their

27   religious beliefs or exert substantial pressure on an adherent to modify his behavior

28   and to violate his beliefs."  Id. at 1031-32 (citation omitted).  "[A]n outright ban on

a particular religious exercise" is generally considered a substantial burden.  <u>Greene v. Solano Cty. Jail</u>, 513 F.3d 982, 988 (9th Cir. 2008) (finding that jail's policy of prohibiting plaintiff, a maximum security prisoner, from attending group religious worship services was a substantial burden).

"'To ensure that courts afford appropriate deference to prison officials,' the Supreme Court has directed that alleged infringements of prisoners' free exercise rights be 'judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" <u>Jones</u>, 791 F.3d at 1032 (quoting <u>O'Lone</u>, 482 U.S. at 349).  Under this reasonableness test, which is set forth in <u>Turner v. Safley</u>, 482 U.S. 78 (1987), the "challenged conduct 'is valid if it is reasonably related to legitimate penological interests.'" <u>Jones</u>, 791 F.3d at 1032 (citations omitted); <u>see also Jones</u>, 791 F.3d at 1032 n.5 (listing factors courts consider under the <u>Turner</u> reasonableness test); <u>Sessing v. Beard</u>, No. 13-1684, 2015 U.S. Dist. LEXIS 84194 at *9-10, 2015 WL 3953501 at *4 (E.D. Cal. June 29, 2015), <u>R&R adopted</u>, 2015 U.S. Dist. LEXIS 151859, 2015 WL 6872807 (E.D. Cal. Nov. 9, 2015) (dismissing complaint on screening; finding "the failure to construct exclusive Odinist worship grounds" and "the denial of access to the fire pit" did not state a claim because "[t]he link between prison security and allowing inmates to use fire is obvious, and the burden of constructing a separate worship area for every minority religion is self-evident").

> **b.**  **RLUIPA**

Section 3 of RLUIPA "relates to religious exercise by institutionalized persons" and "provides that '[n]o [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the government shows that the burden furthers 'a compelling governmental interest' and does so by 'the least restrictive means.'" <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 715 (2005) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)).

Thus, a claim under RLUIPA is similar to a First Amendment claim in that the plaintiff must initially demonstrate that the defendant's actions "constitute a substantial burden on the exercise of his religious beliefs." Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005). "The RLUIPA substantial-burden test is the same as that used under the First Amendment." Sprouse v. Ryan, 346 F. Supp. 3d 1347, 1357 (D. Ariz. 2017). However, "RLUIPA defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" Greene v. Solano Cty. Jail, 513 F.3d 982, 986 (9th Cir. 2008) (quoting 42 U.S.C. § 2000cc-5). RLUIPA therefore "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." Cutter, 544 U.S. at 725 n.13. "[T]he availability of alternative means of practicing religion" is not "a relevant consideration," because "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise ... not whether the RLUIPA claimant is able to engage in other forms of religious exercise." Holt v. Hobbs, 574 U.S. 352, 361-62 (2015) (finding that prison's policy banning beards substantially burdened Muslim prisoner's exercise of his religion, even though the prisoner "had been provided a prayer rug and a list of distributors of Islamic material").

If the plaintiff demonstrates a substantial burden, RLUIPA imposes a "much stricter burden" than the First Amendment. Greene, 513 F.3d at 986; see also Warsoldier, 418 F.3d at 994 (noting that in RLUIPA, "Congress ... replac[ed] the 'legitimate penological interest' standard articulated in Turner"). Once the plaintiff has "met his burden of showing that the ... policy substantially burdened his exercise of religion, the burden shift[s] to the [defendants] to show that" the policy: "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest." Holt, 574 U.S. at 362 (quoting 42 U.S.C. § 2000cc-1(a)).

1    RLUIPA does not allow a plaintiff to recover damages, only injunctive relief.
2    Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015) (citing Sossamon v. Texas,
3    563 U.S. 277 (2011) and Wood v. Yordy, 753 F.3d 899, 903-04 (9th Cir. 2004)).  A
4    RLUIPA claim may not be maintained against prison officials in their individual
5    capacities; the proper Defendant is the CDCR or, as Plaintiff has named here, the
6    CDCR Secretary Allison in her official capacity.  Wood, 753 F.3d at 904 ("[T]here
7    is nothing in the language or structure of RLUIPA to suggest that Congress
8    contemplated liability of government employees in an individual capacity. ... If an
9    individual acts under color of state law to burden a plaintiff's rights to religious
10   exercise, the plaintiff can sue the government.  The statute does not authorize suits
11   against a person in anything other than an official or government capacity....").

12                c.     Equal Protection Clause Claims Under § 1983

13   The Equal Protection Clause of the Fourteenth Amendment requires that all
14   persons who are similarly situated be treated alike.  Lee v. City of Los Angeles, 250
15   F.3d 668, 686 (9th Cir. 2001); City of Cleburne, Tex. v. Cleburne Living Ctr., 473
16   U.S. 432, 439 (1985).  "[T]he Equal Protection Clause entitles each prisoner to a
17   reasonable opportunity of pursuing his faith comparable to the opportunity afforded
18   fellow prisoners who adhere to conventional religious precepts."  Shakur v. Schriro,
19   514 F.3d 878, 891 (9th Cir. 2008) (quoting Cruz v. Beto, 405 U.S. 319, 322
20   (1972)).  To state a claim, Plaintiff must allege facts sufficient to plausibly suggest
21   that prison officials intentionally discriminated against him because of his religion
22   by failing to provide him a reasonable opportunity to pursue his faith compared to
23   other similarly situated religious groups.  Cruz, 405 U.S. at 321-22; Shakur, 514
24   F.3d at 891.  In considering whether a prison improperly discriminated against a
25   prisoner on the basis of religion, courts consider whether, "[u]nder the Turner test,
26   ... the difference between the defendants' treatment of [the plaintiff] and their
27   treatment of ... inmates [of other religions] is reasonably related to legitimate
28   penological interests."  Id. (citation and quotation marks omitted).

1          d.      Effect of Transfer on Claims for Prospective Injunctive Relief

2          A claim for prospective injunctive relief against staff members at a particular

3    correctional facility may be mooted by a prisoner's transfer to another prison.

4    Walker v. Beard, 789 F.3d 1125, 1132 (9th Cir. 2015).  This is because "[o]nce an

5    inmate is removed from the environment in which he is subjected to the challenged

6    policy or practice, absent a claim for damages, he no longer has a legally

7    cognizable interest in a judicial decision on the merits of his claim."  Alvarez v.

8    Hill, 667 F.3d 1061, 1064 (9th Cir. 2012) (citation omitted).  Injunctive relief is not

9    mooted by a transfer if: (1) the prisoner has a "reasonable expectation of returning"

10   to the prison whose conditions he is challenging, or (2) "the policy pursuant to

11   which the alleged violation occurred was 'system wide' and one of the defendants

12   was in charge of the policy."  Walker, 789 F.3d at 1132.

13        **2.     Claims Based on Denial of NHI Group Worship Space at CMC**

14               a.      Dismiss: RLUIPA Claims

15        As noted above, damages are not an available remedy under RLUIPA.

16   Jones, 791 F.3d at 1031.  Any request for an injunction requiring CMC Defendants

17   to give NHI adherents time and space for group worship at CMC would be moot

18   due to Plaintiff's transfer away from CMC.  See id., 791 F.3d at 1031 (finding

19   plaintiff's removal from custody mooted his RLUIPA claim); Epps v. Grannis, 606

20   F. App'x 329, 330 (9th Cir. 2015) ("The district court properly dismissed as moot

21   Epps' RLUIPA claims concerning Calipatria State Prison's package policy and his

22   request for a Kosher diet, because Epps was transferred to another prison during the

23   pendency of his action.").  The SAC does not explicitly seek this type of relief in

24   any event; the only injunctive relief sought in the SAC does not appear to be related

25   to the claims based on denial of NHI group worship in the chapel.  (See SAC at 21

26   [seeking injunctions requiring CDCR officials to: (a) replace Plaintiff's confiscated

27   or damaged personal property; (b) recognize NHI Passover and fast days; (c) not

28   punish NHI adherents for failing to observe Jewish Passover; (d) appoint Plaintiff

1   as an NHI minister or hire an NHI chaplain; (e) replace Plaintiff's lost religious diet

2   card; and (f) provide Kosher ensure drinks to NHI adherents during transfers].)

3       Accordingly, the RLUIPA claims based on the denial of NHI group worship

4   should be dismissed.  The dismissal should be without leave to amend, because

5   Plaintiff has alleged facts showing that his claims are moot, rendering further leave

6   to amend futile.

7               b.    Free Exercise and Equal Protection Claims under § 1983

8       The Court previously dismissed these claims with leave to amend based on

9   Plaintiff's failure to demonstrate that the limitations placed on NHI adherents'

10  access to the chapel impacted their ability to hold group worship services in other

11  areas within the CMC.  (Dkt. 30 at 35.)  The Court noted that Plaintiff appeared to

12  indicate that chapel time was offered under certain conditions or times of day, and

13  if Plaintiff was allowed to worship in other areas of CMC—and was simply denied

14  exclusive access to his preferred space or time of day—such limitations might not

15  impose a substantial burden on his religious practice.  (Id. at 36.)

16      The SAC addresses these issues by alleging that Plaintiff made multiple

17  requests for either chapel time or dedicated yard space for NHI group worship, and

18  that these requests were denied.  (See, e.g., SAC at 3 ¶ 3 [alleging that there was an

19  "outright ban" on "time and space within the chapel"]; id. at 15 ¶ XXVII [alleging

20  that Plaintiff asked Warden Gastelo "why she was denying [the NHI Adherents]

21  time and space in the chapel for worship or the assembly pursuant to yard

22  configurations per DOM [Department Operations Manual] requirements as an

23  alternative"].)

24      The next issue is whether the SAC sufficiently alleges that the named

25  Defendants were personally involved in or responsible for those denials.  "There is

26  no pure respondeat superior liability under § 1983...."  Preschooler II v. Clark

27  County Sch. Bd. of Trs., 479 F.3d 1175, 1182 (9th Cir. 2007).  The plaintiff must

28  allege facts showing either "(1) [the defendant's] personal involvement in the

constitutional deprivation, or (2) a sufficient causal connection between the [defendant's] wrongful conduct and the constitutional violation." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011); see also Preschooler II, 479 F.3d at 1183 ("The requisite causal connection may be established when an official sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional harms.").

**Proceed: Against CRM Bonnifield, Warden Gastelo, and Chaplain Alderson**

The SAC alleges that these Defendants personally denied permission for NHI group worship services and personally met with Plaintiff to discuss those denials, as follows:

- Bonnifield, Gastelo, and Alderson "denied through omissions and failure to act" NHI adherents' June 2017 application for group worship services (SAC at 9 ¶ IV);

- In January 2018, after Chaplain Alderson learned that NHI worship services had been approved and reviewed Plaintiff's proposed "School of Prophets" curriculum, he became "very perturbed with malice" and began "denying the [NHI adherents] time and space within the chapel" (id. at 9-10 ¶ VIII);

- On February 28, 2018, Plaintiff had an interview with Bonnifield, Gastelo and Ombudsman Tami Falconer about the denial of group worship services (id. at 10 ¶ X);

- On an unspecified date Plaintiff had an interview with Alderson and Bonnifield "in [the] chapel by speakerphone conference" during which they "den[ied] [NHI] group chapel services" (id. at 11 ¶ XIII);

- On May 20, 2018, Alderson abruptly cancelled an NHI service scheduled for Sunday (id. at 13 ¶ XXII);

- On June 11, 2018, "an attempt was made to have [a]n NHI service" but "immediately after entrance in the chapel," Bonnifield, Gastelo, and

27

Alderson "colluded with CMC-East Plaza guards to search then pat down all [NHI] participants than abruptly made everyone exit the chapel" (id. at 14 ¶ XXV);

- In or around July 13, 2018, Plaintiff asked Gastelo "why was she denying the [NHI adherents] time and space within the chapel for worship or the assembly pursuant to yard configurations per DOM requirements as an alternative" and she responded, "Just write us up then" (id. at 15 ¶ XXVII);

- On August 28, 2018, Defendant Gastelo "called [Plaintiff] out of the law library to scorn [Plaintiff] with ... discrimination against Plaintiff's desire to practice his NHI religion" (id. at 15 ¶ XXXI); and

- On August 29, 2018, Plaintiff had a "personal interview" with Gastelo "by personal contact on D-Yard at CMC-East regarding no resolutions to the illegal denials of the Plaintiff's practice of his [NHI] religion" (id. at 15 ¶ XXXI).

The SAC also alleges that, in or around the same time, secular and other religious groups were allowed to use the chapel and/or conduct group worship services. (Id. at 9 ¶ III [on November 17, 2017, Muslim Jumah service was held in the Protestant chapel]; id. at 10 ¶ IX [on February 23, 2018, Alderson allowed "Muslims to conduct Jumah services"]; id. at 13 ¶ XXIII [on June 2, 2018, Bonnifield, Gastelo, and Alderson "approv[ed] a secular CGA group in the chapel"]; id. at 14 ¶ XXVI [on June 30, 2018, victim awareness or restorative justice program took place in the chapel]; id. at 18 [generally "all other religions at CMC-East were given ... actual time and space to worship and practice their religion"].)

Accordingly, for PLRA screening purposes, the SAC states § 1983 claims for relief under the Free Exercise and Equal Protection Clauses against Defendants Bonnifield, Gastelo, and Alderson.

28

*Proceed: Against Chief Deputy Warden Samuel, Associate Warden Ingwerson,*
*Captain Steck, and Chaplain Williams*

Plaintiff alleges few if any specific facts supporting these Defendants'
personal involvement in the denial of NHI group worship.  The SAC alleges that:

- Samuel and Steck were "personal[ly] involve[d]" in "denying [NHI] worship" without explaining how (SAC at 5 ¶¶ 1-2);
- Ingwerson had one interview with Plaintiff about the denial of services on July 19, 2017 (id. at 10 ¶ XI);
- Chaplain Williams had one interview with Plaintiff about the denial of services on May 1, 2018 (id. at 12 ¶ XVII), and during inmates' June 11, 2018 attempt to hold NHI services, "colluded" with other Defendants and "CMC-East Plaza guards to search then pat down all [NHI] participants than abruptly made everyone exit the chapel" (id. at 14 ¶ XXV).

These facts alone would likely be insufficient to state a claim against these
Defendants for the denial of NHI group worship.

However, in prior filings, Plaintiff alleged that these Defendants were part of
a Religious Review Committee at CMC.[7]  (Dkt. 26 at 5 [objections to the R&R
partially dismissing the FAC]; see also FAC at 18-19 ¶ L ["All Defendants listed
and named within this Complaint were personally involved by being on the CMC
(RRC) Religious Review Committee"].)  CDCR regulations state that certain
requests for "religious service accommodation" should be "referred to a Religious
Review Committee (RRC) for review and consideration," and that the committee
"shall be comprised of designated chaplains, and a correctional captain or their
designee."  Cal. Code Regs. tit. 15, § 3210(d).  The current SAC mentions the

---

[7] Plaintiff also alleged that Cervantes, litigation coordinator at CMC, was a member of the committee.  (Dkt. 26 at 5; FAC at 20 ¶ 10.)  However, Cervantes is not named as a Defendant in the SAC.  (SAC at 3-7 [listing Defendants].)

committee several times.  (See SAC at 19 ["All Defendants who were personally involved as members of the RRC failed to give Plaintiff equal protection of law."]; id. at 15 ¶ XXX [discussing the confiscation of Plaintiff's musical instruments and referring to "Defendants on the RRC Committee"].)

Accordingly, in light of its duty to liberally construe Plaintiff's allegations, the Court interprets the SAC as alleging that these Defendants denied requests for NHI group worship in their role as members of CMC's Religious Review Committee.  The Court will therefore allow the Free Exercise and Equal Protection § 1983 claims against these Defendants to proceed.

### *Dismiss: Against Chaplain Farao*

The SAC alleges that on May 10, 2018, Plaintiff had a "personal interview" with Chaplain Farao "as to why" NHI adherents were not being given "the same accommodations as other religions such as his Catholic faith, Muslim, and Christians," and Chaplain Farao said that "he was just doing what he was told to do in his rejections...."  (SAC at 12 ¶ XIX.)  These allegations do not indicate that Chaplain Farao had the power to grant NHI adherents permission to hold group worship services in the chapel or elsewhere, or that he refused to do so while granting access to other similarly situated groups.  Accordingly, these allegations fail to state a claim against him under the Free Exercise or Equal Protection Clauses.  These claims against Chaplain Farao should be dismissed with prejudice, because Plaintiff has already been given several opportunities to amend his claims related to denial of NHI group worship and it appears that granting further leave to amend would be futile.  See Williams, 764 F.3d at 1018-19 (affirming district court's finding that the "fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile").

### 3.       Claims Based on Denial of NHI Chaplain or Inmate Minster[8]

CDCR regulations state, "Depending upon the number of inmates of the various faiths, chaplains may be employed or their services may be accepted on a nonpaid volunteer basis."  Cal. Code Regs. tit. 15, § 3210(b).  "When a chaplain of a particular faith cannot be obtained to conduct services within a facility housing inmates of that faith, the institution head may at their discretion ... designate a qualified inmate to minister to the religious needs of inmates for that specific faith."  Cal. Code Regs. tit. 15, § 3211(a).  "In determining the qualifications of an inmate to conduct such services, the institution head will, whenever possible, seek the advice and counsel of outside religious leaders of that faith."  Id.

The SAC alleges that on June 3, 2018, Defendants Bonnifield, Gastelo, Alderson, and Williams designated certain Christian inmates at CMC as ministers under this regulation, even though there were already "hirelings and chaplains employed for their faith plus volunteers endorsing various Christian denominations."  (SAC at 14 ¶ XXIV.)  Plaintiff was not designated as an NHI inmate minister.  He seeks an injunction directing these CMC Defendants to "designate [Plaintiff] as a qualified minister for the religious needs of the [NHI] faith until a 'Hebrew Israelite' chaplain is obtained to conduct services or hired...."  (Id. at 21.)

The Court liberally construes the SAC as alleging that the denial of NHI chaplains and inmate ministers violated Plaintiff's rights under RLUIPA, the Free Exercise Clause, and the Equal Protection Clause.

---

[8] Alternatively, these claims are arguably subject to dismissal as beyond the scope of leave to amend previously granted.  The Court addresses the merits of the claims in an abundance of caution.

31

a.    Dismiss: RLUIPA Claims

As discussed above, damages are not an available remedy under RLUIPA, and some types of prospective injunctive relief are moot due to Plaintiff's transfer away from CMC, the prison where the alleged violations of his rights occurred. See Jones, 791 F.3d at 1031; Epps, 606 F. App'x at 330.  Injunctive relief is not mooted by a transfer if "the policy pursuant to which the alleged violation occurred was 'system wide' and one of the defendants was in charge of the policy."  Walker, 789 F.3d at 1132.

CDCR regulations give "institution heads," i.e., wardens, the power to hire chaplains and appoint inmate ministers, "depending upon the number of inmates of the various faiths" at the institution and the needs of "facility security."  Cal. Code Regs. tit. 15, §§ 3210(a)-(b), 3211(a).  The SAC therefore appears to be seeking an injunction requiring Warden Gastelo to hire an NHI chaplain or appoint an NHI inmate minister at CMC.  The SAC does not appear to be challenging any system-wide policy that could be changed by CDCR Secretary Allison.

Accordingly, this request for injunctive relief and RLUIPA claim arising from the denial of NHI chaplains and inmate ministers at CMC is moot.  This claim should be dismissed without leave to amend because Plaintiff has  alleged facts sufficient to demonstrate mootness, such that further amendment would be futile.

b.    Free Exercise and Equal Protection Claims under § 1983

***Proceed: Against Warden Gastelo***

***Dismiss: Against Bonnifield, Alderson, Williams***

Plaintiff's allegations concerning the lack of an NHI minister at CMC are sufficient to state a claim for relief, but only as to Warden Gastelo.  The relevant CDCR regulation states that the "institution head," i.e., the warden of CMC, may designate inmate ministers.  Cal. Code Regs. tit. 15, § 3211(a).  The fact that CRM Bonnifield, Chaplain Alderson, and Chaplain Williams were present at one meeting where Christian inmate ministers were designated does not demonstrate that they

32

had the power to designate an NHI inmate minister or hire an NHI chaplain. Accordingly, the claims against them should be dismissed without leave to amend, because Plaintiff has already had several opportunities to amend his claims and further amendment appears to be futile.

### 4.    Claims Based on Denial of ILTAG[9]

Under CDCR regulations, "Institution heads may permit the formation of [ILTAGs] which promote educational, social, cultural and recreational interests of participating inmates."  Cal. Code Regs. tit. 15, § 3233.  According to Plaintiff, prisoners who participate in ILTAGs can earn time credits that advance their release date.  (SAC at 4 ¶ 3; id. at 10 ¶ XI.)

The SAC alleges that sometime in 2017, Plaintiff sought permission to have his NHI "School of Prophets curriculum" approved as an ILTAG, but Associate Warden Ingwerson denied that request.  (Id. at 4 ¶ 3.)  At a meeting on August 2, 2017, Warden Gastelo "instructed Plaintiff to submit another M.U.S.I.C. proposal for ... ILTAG."  (Id. at 10-11 ¶ XII.)

The SAC alleges that the denial of the ILTAG "creat[ed] a substantial burden against the Plaintiff's practice of his NHI religion" because it created "substantial pressure on Plaintiff to modify his behavior with violations of [his] beliefs."  (Id. at 4 ¶ 3; see also id. at 10 ¶ XI [alleging that at a meeting with Associate Warden Ingwerson and Warden Gastelo on July 19, 2017 "regarding the [NHI] services being denied," Plaintiff complained that being allowed "to perform secular music with musical instruments during education[al] graduation[s] created a substantial burden through coercion and threats to alter his behavior in order to receive milestones with good time credits"].)

---

[9] Alternatively, these claims are arguably subject to dismissal as beyond the scope of leave to amend previously granted.  The Court addresses the merits of the claims in an abundance of caution.

1             a.      Dismiss: Free Exercise Claims Under § 1983 and RLUIPA

2                  Claims As to All Defendants

3      These allegations fail to state a claim against any Defendant under the Free

4 Exercise Clause or RLUIPA.  The fact that Defendants' denial may have led

5 Plaintiff to choose to engage in secular activities to earn good time credits, rather

6 than religious activities that will not earn him such credits, is not the type of

7 coercion contemplated by Free Exercise and RLUIPA jurisprudence.  See generally

8 Jones, 791 F.3d at 1031-32 ("A substantial burden ... place[s] more than an

9 inconvenience on religious exercise; it must have a tendency to coerce individuals

10 into acting contrary to their religious beliefs or exert substantial pressure on an

11 adherent to modify his behavior and to violate his beliefs") (citation omitted);

12 compare Warsoldier v. Woodford, 418 F.3d 989, 995-96 (9th Cir. 2005) (finding

13 Native American prisoner's free exercise rights were likely violated where he was

14 punished for refusing to cut his hair due to his religious beliefs; the punishments

15 were "designed ... to coerce him into compliance" and included confinement to his

16 cell, additional duty hours, reclassification into a workgroup in which prisoners did

17 not receive time credits or as many privileges, loss of phone call privileges,

18 expulsion from classes, and prohibitions on making purchases at the prison store).

19      Moreover, as to Warden Gastelo, the SAC does not allege that she ever

20 denied permission for the ILTAG; she simply told Plaintiff to submit a new

21 application.  (SAC at 10-11 ¶ XII.)  Thus, the SAC fails to state a claim against her

22 for this reason as well.  See Starr, 652 F.3d at 1207 (plaintiff must show a

23 defendant's "personal involvement in the constitutional deprivation" or a "causal

24 connection between [his] wrongful conduct and the constitutional violation").

25      Additionally, damages are not available under RLUIPA (as discussed above),

26 and the SAC does not seek any injunctive relief related to the denial of the ILTAG.

27 Any request for an injunction requiring CMC officials to recognize an NHI-related

28

ILTAG at CMC would be moot due to Plaintiff's transfer away from CMC.  Thus, the RLUIPA claims should be dismissed for this reason as well.

### b. Dismiss: Equal Protection Claim Under § 1983 as to All Defendants

The allegations that Plaintiff's proposed ILTAG was denied also fail to state a claim under the Equal Protection Clause, because the SAC does not allege that other similarly-situated groups were granted permission to form ILTAGs.  The SAC does not allege that other religious groups were allowed to form ILTAGs, and it appears that CDCR regulations may forbid this.  See Cal. Code Regs. tit. 15, § 3234(b)(3) ("Membership to an activity group shall not be denied on the basis of ... religious ... affiliation....").

All of the claims based on the denial of Plaintiff's proposed ILTAG should be dismissed without further leave to amend, because Plaintiff has already had several opportunities to amend his claims based on denial of NHI religious practices.  See Williams, 764 F.3d at 1018-19 (affirming district court's finding that the "fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile").

### 5. Claims Based on Denial of Banquets

#### a. RLUIPA Claims

#### *Proceed: Against Secretary Allison Only*

The SAC seeks the following injunctive relief regarding the alleged denial of NHI banquets: (a) "allow[ing] [Plaintiff] and all participants in the [NHI] religion to avoid punishments for non-observance of [Jewish] Passover" because they "observe[] prison Passovers in the second month"; and (b) having NHI "holy fast days during the entire month of August ... placed within the CDCR policies and regulations to the same extent of Muslims approved participation and practice of ... Ramadan[] with Eid feasts."  (SAC at 21.)

35

1    These requests are not mooted by Plaintiff's transfer away from CMC,

2   because they request system-wide relief that can be properly sought against CDCR

3   Secretary Allison.  See Walker, 789 F.3d at 1132 (finding claim challenging policy

4   that "regulate[d] the housing of inmates throughout the California prison system"

5   was not mooted by plaintiff's transfer, where it was brought against a defendant

6   who was "the head of the California prison system").  Accordingly, the RLUIPA

7   claims may be brought against her in her official capacity.

8    However, any other claims for injunctive relief related to the banquets appear

9   to be moot due to Plaintiff's transfer away from CMC.  Accordingly, RLUIPA

10   claims against any other Defendants based on the denial of banquets and fast days

11   should be dismissed.

12          b.    Free Exercise and Equal Protection Claims Under § 1983

13    The Court previously dismissed these claims with leave to amend because

14   Plaintiff failed to include enough facts about what the requested banquets entailed,

15   which meant he could not plausibly allege that Defendants' refusal to allow them

16   lacked a reasonable penological justification or failed to further a compelling

17   government interest.  (Dkt. 30 at 26.)

18    The SAC sufficiently addresses these concerns for purposes of PLRA

19   screening.  Liberally construed, the SAC appears to allege that NHI adherents

20   sought permission to hold Passover banquets, which were similar to Jewish

21   Passover celebrations but held at a different time of year.  (See SAC at 11 [alleging

22   that Plaintiff had an interview "regarding [NHI] Passover in the second month"]; id.

23   at 21 [seeking an order "allow[ing] [Plaintiff] and all participants in the [NHI]

24   religion to avoid punishments for non-observance of [Jewish] Passover" because

25   they "observe[] prison Passovers in the second month"]; id. [citing Cal. Code Regs.,

26   tit. 15, section 3054.2(e), which states that Jewish Passover  "constitutes a single

27   religious event, requiring kosher for Passover foods to be provided during the eight

28   days of observance"].)

The next issue is whether the SAC sufficiently alleges that the Defendants discussed in connection with the denial of the banquets— CRM Bonnifield, Warden Gastelo, Captain Steck, Chaplain Alderson, and Associate Warden Ingwerson—were personally involved in or responsible for the denials of the banquets.

### *Proceed: Against CRM Bonnifield, Warden Gastelo, and Chaplain Alderson*

On April 9, 2018, Plaintiff had an "interview" with Chaplain Alderson "regarding [NHI] Passover in the second month."  (Id. at 11 ¶ XIV.)  On May 17, 2018, Plaintiff had an "interview" with a food manager Ms. Tucker and a "conference with" CRM Bonnifield and Chaplain Alderson "regarding why were ... the [NHI adherents] ... being denied banquets, religious services with foods of religious significance...."  (Id. at 13 ¶¶ XX.)  Ms. Tucker stated that she could not do anything if Warden Gastelo "continue[d] to deny Plaintiff's religious meal/food requests forms."  (Id.)

These allegations are sufficient, at the screening stage, to show that Defendants Alderson, Bonnifield, and Gastelo were personally involved in the denial of religious banquets.

### *Proceed: Against Captain Steck and Associate Warden Ingwerson*

Unlike the other Defendants discussed above, Plaintiff does not allege that he met with these Defendants about the banquets or explain when they denied his request to hold the banquets.  The SAC simply alleges that they "obstructed and denied with prejudice" Plaintiff's request for the banquets.  (SAC at 11 ¶ XVI.)  The bare allegation that these Defendants denied permission for the banquets— without explaining when or how—would likely be insufficient to hold them liable under § 1983, even if accepted as true.

However, as discussed above in section IV.D.2.b. (regarding denial of NHI group worship), Plaintiff alleged in prior filings that these Defendants were part of a Religious Review Committee at CMC.  (See Dkt. 26 at 5 [objections to the R&R

1   partially dismissing the FAC, alleging that Defendants Samuel, Ingwerson, Steck,
2   and Williams were members of the CMC Religious Review Committee]; <u>see also</u>
3   FAC at 18-19 ¶ L ["All Defendants listed and named within this Complaint were
4   personally involved by being on the CMC (RRC) Religious Review Committee"];
5   SAC at 19 ["All Defendants who were personally involved as members of the RRC
6   failed to give Plaintiff equal protection of law."]; <u>id.</u> at 15 ¶ XXX [discussing the
7   confiscation of Plaintiff's musical instruments and referring to "Defendants on the
8   RRC Committee"].)  Accordingly, in light of its duty to liberally construe
9   Plaintiff's allegations, the Court interprets the SAC as alleging that these
10  Defendants denied requests for NHI banquets in their role as members of the
11  CMC's Religious Review Committee.  The Court will therefore allow the claims
12  against these Defendants to proceed.[10]

13      **6.    Claims Based on Forcing Plaintiff to Work on the NHI Sabbath**
14      Plaintiff claims that his rights under RLUIPA and the Free Exercise Clause[11]
15  were violated because he was forced to work on the NHI Sabbath, which is
16  supposed to be a day of rest.  (<u>See</u> SAC at 7 ¶ 5.)  The Court previously dismissed
17  these claims with leave to amend, finding that the FAC did not allege sufficient
18  facts about the work assignment, such as what accommodation Plaintiff requested
19  from Defendants, why that accommodation was denied, and whether Plaintiff was
20

21      [10] The Court notes that, although Defendants Deputy Warden Samuel and
22  Chaplain Williams were also alleged to be members of the RRC, the SAC does not
    mention them in connection with the denial of banquets.  (<u>See</u> SAC at 11 ¶ XVI; <u>id.</u>
23  5 ¶ 1 [alleging only that Samuel "den[ied] [NHI] worship"]; <u>id.</u> at 6 ¶ 4 [alleging
24  only that Williams "den[ied] Plaintiff to practice his NHI religion in [the] CMC-
    East chapel"].)  If Plaintiff intended to bring the banquet-related claims against all
25  Defendants on the RRC, then he should clarify this in his objections to this R&R.

26      [11] The Court does not interpret the SAC as alleging an Equal Protection claim
27  based on Plaintiff's work assignment, because the SAC does not allege that inmates
    of other faiths were given religious accommodations as to their work assignments.
28

punished or threatened with punishment if he failed to work on the Sabbath.
Absent more detail, the Court found, the FAC failed to plausibly allege that the
work assignment substantially burdened Plaintiff's religious practice or that
Defendants' actions lacked a penological justification or failed to further a
compelling government interest.  (Dkt. 30 at 33-34 [prior R&R]; Dkt. 32 [order
accepting R&R].)

The SAC sufficiently addresses these issues for purposes of PLRA screening
by alleging that Plaintiff was "threatened with punishment if he didn't work on his
holy Sabbath days" and that he "request[ed] alternative accommodations such as
LTOP modules [or] education...."  (SAC at 8 ¶ I; id. at 7 ¶ 5.)[12]  See Jones, 791 F.3d
at 1031-32 ("A substantial burden ... place[s] more than an inconvenience on
religious exercise; it must have a tendency to coerce individuals into acting contrary
to their religious beliefs or exert substantial pressure on an adherent to modify his
behavior and to violate his beliefs."); Peets v. Brown, No. 18-cv-2469, 2019 U.S.
Dist. LEXIS 60932 at *3, 2019 WL 1539183 at *1 (E.D. Cal. Apr. 9, 2019) (finding
that Jewish prisoner stated free exercise claim by alleging that defendants
"attempt[ed] to force him to work on the Sabbath and [gave] him repeated write ups
for refusing to work on the Sabbath").  The next issue is whether the SAC
sufficiently alleges that the Defendants named in connection with Plaintiff's work

_____

[12] See generally Cal. Code Regs. tit. 15, § 3040(a) ("Every able-bodied"
prisoner "is obligated to work as assigned.... Assignment may be up to a full day of
work, or other programs including Rehabilitative Programs managed by the
Division of Rehabilitative Programs... or a combination of work or other
programs."); id., § 3210(a) ("Institution heads shall make every reasonable effort to
provide for the religious and spiritual welfare of all interested inmates, including,
but not limited to, affording inmates a reasonable accommodation to attend a
scheduled Religious Service if they are unable to do so due to conflicting
work/education assignments. Reasonable accommodation may include, but is not
limited to, modified work schedule, use of accrued time or allowable breaks,
granting of a job/assignment change, changes of regular days off, etc.").

assignment—Gomez and Reynoso—were personally involved in or responsible for the alleged violation of Plaintiff's rights.

a.    Dismiss: RLUIPA Claims

As discussed above, damages are not an available remedy under RLUIPA. None of the injunctive relief explicitly requested in the SAC appears to be related to the claim that Plaintiff was forced to work on the NHI Sabbath.  (See SAC at 21 [seeking injunctions requiring CDCR officials to: (a) replace his confiscated or damaged personal property; (b) recognize NHI Passover and fast days; (c) not punish NHI adherents for failing to observe Jewish Passover; (d) appoint Plaintiff as an NHI minister or hire an NHI chaplain; (e) replace Plaintiff's lost religious diet card; and (f) provide Kosher ensure drinks to NHI adherents during transfers].) Moreover, to the extent Plaintiff is seeking an injunction requiring CMC officials to give him a new work assignment, this type of relief would be moot due to Plaintiff's transfer away from CMC.

Accordingly, the RLUIPA claims based on Sabbath work should be dismissed as moot.  The dismissal should be without leave to amend because it appears amendment would be futile; Plaintiff has already had several opportunities to amend his claims.  See Williams, 764 F.3d at 1018-19 (affirming district court's finding that the "fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile").

b.    Free Exercise Claims Under § 1983

***Proceed: Against Custody Case Worker Gomez***

In prior pleadings, Plaintiff alleged that on April 14, 2017, he was placed on a "yard crew" in "position number: 4DW.001.004" and required to work on Saturdays from 7:30 to 11:30.  (FAC at 15 ¶ F.)  The SAC alleges that Defendant Gomez, a custody case worker, "den[ied] Plaintiff to practice his [NHI] religion with threats of punishment if he didn't work on his Holy Sabbath days."  (SAC at 7

¶ 4.)  According to Plaintiff's "Nazarite vows," he is required to "keep[] the Sabbath Day rest 'holy' where no work should be involuntarily enforced."  (Id. at 7 ¶ 5.)

The Court liberally construes these allegations to meant that, after being assigned to work on the NHI Sabbath, Plaintiff requested a different work assignment from his custody case worker, Gomez, who refused to change the assignment and threatened Plaintiff with punishment if he did not work on the Sabbath.  For PLRA screening purposes, this is sufficient to state a claim against Defendant Gomez.

### Dismiss: Against Appeals Coordinator Reynoso

The SAC alleges that Defendant Reynoso, an appeals coordinator, "denied the Plaintiff's request for alternative accommodations such as LTOP modules, education, or practicing his [NHI] religion to avoid substantial burden created by Defendants threats [sic] of harm and punishment if he didn't violated his Nazarite vows of keeping the Sabbath Day rest 'holy' where no work should be involuntarily enforced."  (SAC at 7 ¶ 5.)  The Court interprets these allegations as meaning that Defendant Reynoso denied a grievance Plaintiff filed about his work assignment. (See FAC at 15 ¶ F [alleging that Plaintiff challenged his work assignment in appeal no. CMC-E-18-00548].)

The weight of legal authority in this circuit is against imposing liability solely based on the defendant's denial of an administrative grievance.  As the Seventh Circuit has reasoned:

> [A] brief word about George's claims against the defendants who
> handled his administrative protests concerning the events covered by
> the complaint. … George's argument on the merits is that anyone who
> knows about a violation of the Constitution, and fails to cure it, has
> violated the Constitution himself.  That proposition … is not correct.
> Only persons who cause or participate in the violations are

1       responsible. … Ruling against a prisoner on an administrative

2       complaint does not cause or contribute to the violation.  A guard who

3       stands and watches while another guard beats a prisoner violates the

4       Constitution; a guard who rejects an administrative complaint about a

5       completed act of misconduct does not.

6 George v. Smith, 507 F.3d 605, 609-10 (7th Cir. 2007).  Courts in this circuit

7 generally agree that denying an inmate appeal does not, by itself, lead to liability.

8 See Phillipi v. Patterson, No. 13-cv-01514, 2014 U.S. Dist. LEXIS 105865 at *7,

9 2014 WL 11774836 at *3 (E.D. Cal. Aug. 1, 2014) (citing George for the

10 proposition that "denial of an inmate appeal … does not state a cognizable

11 constitutional violation"), aff'd, 599 F. App'x 288 (9th Cir. 2015); Baldhosky v.

12 Hubbard, No. 12-cv-01200, 2018 U.S. Dist. LEXIS 45667 at*8-9, 2018 WL

13 1392058 at *3 (E.D. Cal. Mar. 20, 2018) (dismissing "claims alleging that

14 individuals who[se] identities are apparently presently unknown reviewed his health

15 care services requests and failed to act in violation of his constitutional rights,"

16 citing George, and noting that "denial of a prisoner's administrative requests

17 generally does not cause or contribute to any underlying constitutional violation"

18 unless prison administrators "willfully turn a blind eye to constitutional violations

19 being committed by subordinates"); Thomas v. Matevousian, No. 17-cv-1592, 2018

20 U.S. Dist. LEXIS 46663 at*9, 2018 WL 1452261 at *4 (E.D. Cal. Mar. 21, 2018)

21 ("Actions in reviewing a prisoner's administrative appeal generally cannot serve as

22 the basis for liability in a section 1983 action."); Hernandez v. Cate, 918 F. Supp.

23 2d 987, 1010, 1018 (C.D. Cal. 2013) (holding that "[r]uling against a prisoner on an

24 administrative complaint does not cause or contribute to [a section 1983] violation"

25 but denying motion to dismiss claims plausibly suggesting that other defendants

26

27

28

"were involved in authorizing or implementing the modified programs at issue")
(quoting George, 507 F.3d at 609-10).[13]

Accordingly, the SAC fails to show that Appeals Coordinator Reynoso
sufficiently caused or contributed to Plaintiff being assigned to work on the NHI
Sabbath.  The § 1983 claim against Reynoso should be dismissed without leave to
amend, because Plaintiff has already had several opportunities to amend his claims
and further amendment appears to be futile.  See Williams, 764 F.3d at 1018-19
(affirming district court's finding that the "fact that Plaintiffs have already had two
chances to articulate clear and lucid theories underlying their claims, and they failed
to do so, demonstrates that amendment would be futile").

**7.    Claims Based on Confiscation of Musical Instruments from**
**Plaintiff's Cell**

a.    Allegations in the SAC and Prior Pleadings

Although Plaintiff's pleadings have consistently alleged that musical
instruments were taken from his cell, they have not been clear about who did so,
when, and why.

The initial Complaint alleged that CRM Bonnifield "violated the Plaintiff's
Constitutional rights with retaliations for filing appeals ... when he displayed the
appeal to other members in the choir and hand their [sic] keyboards removed from
their cells" because Plaintiff complained about religious art that "portrayed [the
Christian] Apostles as European gentiles...."  (Compl. at 6.)

In the FAC, Plaintiff alleged that he experienced "ethnicity and religious
discrimination" when, "on July 9, 2018 ... Chaplain ... Alderson directed staff to

---

[13] But see Stevenson v. Beard, 16-cv-03079, 2018 U.S. Dist. LEXIS 70639 at
*25, 2018 WL 1963674 at *9 (S.D. Cal. Apr. 26, 2018) ("Presumably, reviewers at
each level of appeal conduct personal reviews of the appeals before drafting a letter
either granting or rejecting the appeal.  This personal review of the appeal amounts
to personal participation in the Plaintiff's alleged constitutional injury....").

enter the Plaintiff's cell without his presence to retrieve and illegally confiscate musical instruments," i.e., an Epiphone Les Paul guitar, Charvel mini amplifier, and "portable keyboard," which "were donated to the [NHI adherents] and approved by memorandum on 6/16/2018 because the Plaintiff was authorized to conduct music ministry, mental health performances in the gym[,] and [NHI] banquets...."  (FAC at 15 ¶ H.)  However, a memo attached to the FAC appeared to indicate that at least some of these instruments belonged to CMC rather than Plaintiff.  (Id. at 20 [June 2018 memo, signed by Chaplain Alderson, granting Plaintiff "permission for use of east Protestant chapel's musical instruments ... for his work in the Chapel's Music Ministry, Mental Health Performances in the Gym and [NHI] banquets"]; see also Dkt. 26 at 4-5 ¶ 8 [objections to the R&R screening the FAC, attempting to clarify ownership of the instruments].)

The Court dismissed these allegations with leave to amend, directing Plaintiff to include more facts about the instruments and why they were taken from his cell. (Dkt. 30 at 32-33.)

The SAC alleges as follows: As of January 2018, Plaintiff had a Radio Shack keyboard and an Epiphone Les Paul guitar in his cell; these instruments were donated to him by other NHI adherents or supporters for use in NHI religious ceremonies.  (SAC at 9 ¶ V-VII.)  Plaintiff also had a Charvel mini amplifier and a Yamaha keyboard in his cell, which belonged to the CMC Protestant chapel; Chaplain Alderson, the Protestant chaplain, granted Plaintiff permission to keep these instruments in his cell so that he could practice for his "professional[]" (i.e., secular) performances "in the gym [and] mental health building."  (Id. at 9 ¶ VII; id. at 3 ¶ 3.)  Regarding the confiscation of these instruments, the SAC alleges:

> After [an] interview with Defendant Jim Bonnifield on 08/16/2018 he
> displayed and implemented retaliation tactics by telling other inmates
> Plaintiff's confidential information to incite retribution with causal
> connections with other Defendants Josie Gastelo and H. Warren

1      Alderson, and Mark Williams and inclusive with Defendants on the

2      RRC Committee that the reason he is confiscating their musical

3      appliances was because of the Plaintiff's all-out attempts to practice

4      his NHI religion which is denied with prejudice.

5  (Id. at 15 ¶ XXX.)  Plaintiff alleges that the confiscation violated his rights under

6  RLUIPA and the Free Exercise Clause, and he seeks an order requiring Defendants

7  to replace the guitar.  (See id. at 20 ["The Free Exercise and RLUIPA claims

8  protect Plaintiff's right to maintain" his guitar]; id. at 21 ["Plaintiff's guitar was

9  confiscated and not returned whereby music is a vital part of the [NHI adherents']

10  exegesis and liturgy.  These items for religious observance, practice, and fellowship

11  can only be replaced with injunctive relief."].)

12              b.      Dismiss: All Claims Against All Defendants

13      Plaintiff's description of when and why his musical instruments were

14  confiscated remains vague and ambiguous.  It is unclear why Plaintiff believes that

15  CRM Bonnifield (rather than Chaplain Alderson, as he at one point alleged) was the

16  Defendant who ordered the instruments removed from Plaintiff's cell.  It is unclear

17  if Plaintiff is saying that CRM Bonnifield *told* Plaintiff that he was confiscating the

18  musical instruments because of grievances Plaintiff filed about the denials of NHI

19  religious practices, or if Plaintiff had some *other* reason to believe that.  It is also

20  unclear when the confiscation happened: the SAC alleges that it happened after an

21  August 2018 meeting with CRM Bonnifield, but earlier pleadings alleged that it

22  happened in July 2018.

23      Given that the basic facts about the confiscation remain unclear, the SAC

24  fails to state a claim for relief under RLUIPA or the Free Exercise Clause.  See

25  generally Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must

26  contain ... a short and plain statement of the claim showing that the pleader is

27  entitled to relief...."); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (noting

28  that the purpose of this rule is to "give the defendant fair notice of what the

1   ... claim is and the grounds upon which it rests" and that "[f]actual allegations must

2   be enough to raise a right to relief above the speculative level") (citation omitted).

3   These claims should be dismissed without leave to amend because Plaintiff has

4   already been given several opportunities to amend these claims.  See Williams, 764

5   F.3d at 1018-19 (affirming district court's finding that the "fact that Plaintiffs have

6   already had two chances to articulate clear and lucid theories underlying their

7   claims, and they failed to do so, demonstrates that amendment would be futile").

8         **8.**     **Loss and/or Damage to Plaintiff's Religious Property During**

9                    **Transfer from CMC to CHCF**

10            a.     Allegations in the SAC

11  As of January 2019 at CMC, Plaintiff had the following religious property:

12  (a) a "Hebrew crown" or "Keter" made of "hand-knitted, soft material," which was

13  "multicolored religious headgear covering [the] entire head [as] opposed to a

14  Jewish skull cap," (b) a sterling silver necklace with a Star of David medallion,

15  (c) a religious "'scroll' in Hebrew Tenakh," (d) a hot pot that he used to prepare

16  religious foods, and (e) a JWIN radio/music player that he used to listen to religious

17  music.  (SAC at 5 ¶ 3 [describing the property]; id. at 21 [alleging that Plaintiff's

18  hot pot was used for "distribution of religious foods with significance to all [NHI]

19  participants commonly known as 'spreads'" and that "music is a vital part of the

20  [NHI] exegesis and liturgy"].)

21  In or around January 12, 2019, Plaintiff was scheduled to be transferred to

22  CHCF, and CO Davidson reviewed these items as part of "property transfer

23  packing."  (Id. at 5 ¶ 3.)  CO Davidson "became hostile" and told Plaintiff that he

24  was "not leaving with his religious property nor appliances."  (Id.)  Plaintiff appears

25  to allege that CO Davidson did not allow Plaintiff to wear his Keter during transfer,

26  even though official CDCR policy allows this.  (See id. [alleging that Plaintiff

27  showed CO Davidson "his granted appeal and State of California memorandum

28  dated November 20, 2008 inclusive with CMC appeal log #E-06-02488 approving

the Plaintiff to wear his religious apparel at all times pursuant to" California Code of Regulations, title 15, section 3213]); see Cal. Code Regs. tit. 15, § 3213(b) ("An inmate may possess any religious item authorized in the Religious Personal Property Matrix (RPPM) (Rev. 6/27/13), which is incorporated by reference in subsection 3190(b).  As defined in the RPPM, and subject to reasonable search by staff, an inmate may wear or carry at any time, the following: ... religious medallion and chain, religious headgear...."); Appendix B, CDCR Religious Personal Property Matrix, https://www.cdcr.ca.gov/regulations/cdcr-regulations/dom-appendices/ (listing specific requirements and restrictions for religious medallions and chains, head gear, and texts).

When Plaintiff arrived at CHCF, he discovered that his JWIN radio/music player was "broken and tampered with."  (SAC at 5 ¶ 3.)  His religious headgear, scroll, Star of David necklace, and hot pot were not returned to him.  (See id. at 21 [seeking an injunction requiring Defendants to replace the scroll, Star of David necklace, and hot pot]; see also FAC at 5, 9 [referring to these items as "lost" or "destroyed"].)  Plaintiff filed grievances asking "for CO Davidson to return Plaintiff's property lost and destroyed," but "no compensation by replacement of Plaintiff's property has been received."  (SAC at 5 ¶ 3; see also FAC at 18 ¶ K [referring to appeal nos. CMC-E-17-01019, CMC-19-02703, and CHCF-19-03736].)

               b.     RLUIPA Claims and Free Exercise and Equal Protection Claims
                      Under § 1983
                                *Proceed: Against CO Davidson*

These allegations are sufficient to state a claim for relief under RLUIPA and the Free Exercise Clause, for purposes of screening under the PLRA.  Despite Plaintiff's transfer to CHCF, the SAC's request for injunctive relief in the form of replacement of the lost and/or damaged property is not moot, because it is relief the Court could theoretically still grant.  The SAC plausibly alleges that the damage to

or confiscation of Plaintiff's property substantially burdened his religious practice, because he explains how the items related to that practice.  The SAC also plausibly alleges that the confiscation of or damage to the property was not reasonably related to legitimate penological interests or in furtherance of a compelling governmental interest.  Liberally construed, the SAC appears to allege that CO Davidson acted "hostile" toward Plaintiff and ignored official CDCR policies by refusing to let Plaintiff wear his religious headgear during his transfer to CHCF and telling Plaintiff that he would not be allowed to take his religious items to CHCF.

The next issue is whether Plaintiff has sufficiently alleged that Defendants were personally involved in or responsible for the alleged violation of Plaintiff's rights.  The Court finds that the SAC states a claim against CO Davidson, who the SAC says personally packed Plaintiff's property for transfer and indicated that certain items might be confiscated.  As discussed above, however, the RLUIPA claim may only be brought against CO Davidson in his official capacity.  See Wood, 753 F.3d at 904 ("If an individual acts under color of state law to burden a plaintiff's rights to religious exercise, the plaintiff can sue the government. The statute does not authorize suits against a person in anything other than an official or governmental capacity....").

### *Dismiss: Gomez, Reynoso, Moloney, Farao*

The SAC also alleges that "Defendants R. Gomez, M. Reynoso, Patrick Moloney, [and] John Farao ... each were personally involved" in the "deprivations of receiving authorized and religious property ... with denials to wear prescribed religious attire, apparel, and medallion even after compensation with prison staff liability was documented."  (SAC at 20.)  To the extent the SAC is attempting to hold Appeals Coordinator Reynoso liable simply for denying Plaintiff's grievances about this incident, this fails to state a claim for the reasons discussed above in section IV.D.6.b (regarding the Sabbath work claims).  See George, 507 F.3d at 609-10 ("Ruling against a prisoner on an administrative complaint does not cause

or contribute to the violation."); Phillipi, 2014 U.S. Dist. LEXIS 105865 at *7, 2014 WL 11774836 at *3 (citing George for the proposition that "denial of an inmate appeal … does not state a cognizable constitutional violation").  Regarding the other Defendants, the SAC fails to explain how they were involved in the damage to and/or loss of Plaintiff's property during his transfer from CMC to CHCF.  The claims against these other Defendants should be dismissed without leave to amend, because Plaintiff has already been given several opportunities to amend these claims.  See Williams, 764 F.3d at 1018-19 (affirming district court's finding that the "fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile").

**E.      First Amendment Retaliation Claims Under § 1983**

      **1.      Legal Standards**

It is well established that prisoners have a First Amendment right to litigate and file prison grievances.  See Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005); see also Blaisdell v. Frappiea, 729 F.3d 1237, 1243 (9th Cir. 2013); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).  Prisoner plaintiffs must allege the following in order to state a § 1983 claim for retaliation: (1) prison officials took adverse action against the inmate; (2) the adverse action was taken because the inmate engaged in conduct protected by the First Amendment; (3) the adverse action chilled the inmate's First Amendment rights; and (4) the adverse action did not serve a legitimate penological purpose.  Rhodes, 408 F.3d at 567-68.

To establish retaliatory motive, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." Brodheim, 584 F.3d at 1271 (citation and quotation marks omitted).  Plaintiff may offer either direct or circumstantial evidence of retaliatory motive.  McCollum v. Cal. Dep't of Corrs. & Rehab., 647 F.3d 873, 882 (9th Cir. 2011).  Circumstantial evidence may include: "(1) proximity in time between protected speech and the

alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse ... action were false and pretextual." Id.; see, e.g., Quiroz v. Short, 85 F. Supp. 3d 1092, 1101 (N.D. Cal. 2015) (finding no proximity of time, expression of opposition, or evidence suggesting prison officials motives were false or pretextual).

### 2.    Dismiss: Against Defendant Farao[14]

The SAC appears to allege that Defendant Farao denied Plaintiff permission to participate in an inmate visitation program in retaliation for Plaintiff seeking permission for NHI group worship and banquets.  The SAC alleges as follows:

- Chaplain Farao was the CMC Catholic chaplain and "coordinator for Get-On-The-Bus as 'sponsor.'"  (SAC at 6 ¶ 5.)
- Starting in June 2017 and continuing throughout 2018, Plaintiff unsuccessfully sought permission for NHI group worship and banquets.  (Id. at 9-13.)
- On September 26, 2017, Chaplain Farao "denied Plaintiff to practice his [NHI] religion" (id. at 6 ¶ 5) by kicking him out of the chapel (FAC at 17).
- On April 12, 2018, Chaplain Farao "den[ied] Plaintiff [permission] to participate in [the] Get-On-The-Bus [program] even though criteria was met for the event ... out of spite and malice ... towards Plaintiff's

---

[14] Although the prior R&R did not discuss a retaliation claim against Defendant Farao, the FAC did contain vague allegations about the "Get-On-The-Bus" visitation program and indicate Defendant Farao was somehow involved in denying Plaintiff visitation.  (See FAC at 5 ¶ 7; id. at 17.)  Thus, although this claim is arguably outside the scope of amendment allowed by the Court's prior order, the Court addresses the merits of this claim in an abundance of caution.

advocating equal protection....  Defendant held a grudge against Plaintiff."
(SAC at 11 ¶ XV.)

- On May 10, 2018, during an interview with Chaplain Farao, Plaintiff asked why NHI adherents were not being treated the same as other religions, and Chaplain Farao replied that "'he was just doing what he was told to do in his rejections' without further comments."  (Id. at 12 ¶ XIX.)

- On May 19, 2018, "Plaintiff was called over the institution's intercom at CMC-East to report to the visiting room for Get-On-The-Bus visiting, only to be denied with ... discrimination against Plaintiff's [NHI] faith, otherwise the same accommodations would have been provided to the Plaintiff as were to other inmates."  (Id. at 13 ¶ XXI.)

These allegations are insufficient to state a claim for retaliation against Defendant Farao.  Essentially, Plaintiff alleges that: (a) Chaplain Farao denied Plaintiff permission to participate in the Get-On-The-Bus visitation program, even though Plaintiff met the criteria for it; (b) around the same time, his requests for NHI religious activities were being denied; and (c) Defendant Farao was aware that permission for NHI religious activities was being denied.  The fact that permission for NHI religious activities and Get-On-The-Bus participation were denied around the same time is not, alone, sufficient to establish a retaliatory motive, particularly given the minimal information Plaintiff provides about the Get-On-The-Bus program and (as discussed above in section IV.D.2.b. regarding Plaintiff's RLUIPA, Free Exercise, and Equal Protection claims) Chaplain Farao's minimal involvement in the denial of NHI religious activities.  See, e.g., Williams v. Botich, No. 05-cv-02877-TJH-AN, 2010 U.S. Dist. LEXIS 150069 at *16-17, 2010 WL 11534578 at *6 (C.D. Cal. Sept. 3, 2010) ("[W]hile the proximity of the time between these two events can properly be considered as circumstantial evidence of retaliatory intent, suspect timing alone is insufficient to establish the crucial factual link."), R&R adopted, 2010 U.S. Dist. LEXIS 150070, 2010 WL 11537529 (C.D.

Cal. Sept. 24, 2010), aff'd, 459 F. App'x 620 (9th Cir. 2011); Lloyd v. Rufener, No. 17-cv-5627, 2019 U.S. Dist. LEXIS 77901 at *20-21, 2019 WL 2583167, at *8 (W.D. Wash. Jan. 9, 2019) ("[T]he fact that plaintiff had filed numerous kites and grievances related to his medical care during the same general time period that his medication was stopped is not sufficient in and of itself to state a retaliation claim and plaintiff fails to state additional facts linking the medication stoppages with his grievances."), R&R adopted, 2019 U.S. Dist. LEXIS 77153, 2019 WL 2004437 (W.D. Wash. May 7, 2019).

In sum, the SAC fails to state a § 1983 claim against Chaplain Farao for retaliation, because the facts alleged in the SAC do not plausibly suggest that Farao had a retaliatory motive for denying Plaintiff access to the Get-On-The-Bus program. This claim should be dismissed without further leave to amend, because Plaintiff has already had several opportunities to amend this claim and further amendment appears to be futile. See Williams, 764 F.3d at 1018-19 (affirming district court's finding that the "fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile").

### 3. Dismiss: Against CRM Bonnifield[15]

The SAC appears to allege that, in retaliation for Plaintiff seeking permission for NHI religious activities, CRM Bonnifield confiscated Plaintiff's musical instruments and told other inmates confidential information about Plaintiff. As discussed above in section IV.D.2 and IV.D.5 (regarding Plaintiff's Free Exercise, RLUIPA, and Equal Protection claims), in 2017 and 2018 CRM Bonnifield denied

---

[15] Although the FAC did not appear include a retaliation claim based on confiscation of the musical instruments, it did discuss that confiscation in the context of other claims. Thus, although this claim is arguably outside the scope of amendment allowed by the Court's prior order, the Court addresses the merits of this claim in an abundance of caution.

permission for NHI religious activities and attended multiple meetings with Plaintiff about it.  The SAC then alleges as follows:

- "After an interview with Defendant Jim Bonnifield on 08/16/2018, he displayed and implemented retaliation tactics by telling other inmates Plaintiff's confidential information to incite retribution with causal connections with other Defendants Josie Gastelo, H. Warren Alderson, and Mark Williams and inclusive with Defendants on the RRC Committee that the reason he is confiscating [the NHI adherents'] musical appliances was because of the Plaintiff's all-out attempts to practice his NHI religion which is denied with prejudice."  (SAC at 15 ¶ XXX.)

- On August 28, 2018, Defendant Gastelo "called [Plaintiff] out of the law library to scorn [Plaintiff] with ... discrimination against Plaintiff's desire to practice his NHI religion...." (Id. at 15 ¶ XXXI.)

These allegations are too vague to state a claim for retaliation under the First Amendment.  First, Plaintiff does not explain what type of confidential information CRM Bonnifield told other inmates, and without this information the Court cannot find that such retaliation would chill the average inmate's protected behavior. Second, there are not enough facts to plausibly suggest that the confiscation of Plaintiff's musical instruments was retaliatory.  The Court notes that prior pleadings alleged that the instruments were confiscated in July 2018 rather than August 2018, and by Chaplain Alderson rather than CRM Bonnifield.  (See FAC at 15.)  It is not clear why Plaintiff now believes that CRM Bonnifield was involved in the confiscation or why Plaintiff believes that his motives were retaliatory.  As discussed above, suspect timing alone is not enough.

This claim should be dismissed with prejudice because Plaintiff has already had several opportunities to amend this claim.  See Williams, 764 F.3d at 1018-19

1    (affirming district court's finding that the "fact that Plaintiffs have already had two

2    chances to articulate clear and lucid theories underlying their claims, and they failed

3    to do so, demonstrates that amendment would be futile").

4    **F.    Claims Based on Assault with Fire Extinguisher**

5          Plaintiff previously alleged that excessive force was used against him when

6    he was sprayed with a fire extinguisher for praying "in a loud voice ... in his Holy

7    Tongues" on an involuntary transfer bus.  (Compl. at 7; see also Dkt. 26 at 2

8    [objections to prior R&R].)  The Court dismissed this claim with leave to amend,

9    directing Plaintiff to include more facts about the incident.  (Dkt. 10 at 14; Dkt. 30

10   at 42-43.)

11         In the SAC, Plaintiff states that he "was denied treatment at CMC-East ...

12   after being injured [by] being sprayed with [a] fire extinguisher" (SAC at 20) and

13   refers to an "assault for practicing his NHI religion" (id. at 19).  However, he does

14   not include any further facts about the incident—such as when it occurred or who

15   sprayed him—or about any injuries he suffered.  These allegations therefore again

16   fail to state a claim under the Eighth Amendment.  Because Plaintiff was given an

17   opportunity to amend and failed to add any relevant facts, this claim should be

18   dismissed without further leave to amend.  See Williams, 764 F.3d at 1018-19

19   (affirming district court's finding that the "fact that Plaintiffs have already had two

20   chances to articulate clear and lucid theories underlying their claims, and they failed

21   to do so, demonstrates that amendment would be futile").

22   **G.    Claims Against Chaplain Alderson's Predecessor**

23         The SAC brings claims against Chaplain Alderson "and predecessor."  (SAC

24   at 3 ¶ 3.)  However, the SAC does not allege any facts showing what the

25   predecessor did or did not do to violate Plaintiff's constitutional rights.

26   Accordingly, claims against the predecessor should be dismissed.  Because Plaintiff

27   has already been granted several chances to amend his claims, this claim should be

28   dismissed without further leave to amend.  See Williams, 764 F.3d at 1018-19

(affirming district court's finding that the "fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile").

## V.

## RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Court issue an order:

(1)     approving and accepting this R&R;

(2)     allowing the following claims to proceed:

 (a)     Free Exercise and Equal Protection § 1983 claims based on denial of NHI group worship at CMC against Defendants Bonnifield, Gastelo, Alderson, Samuel, Ingwerson, Steck, and Williams in their individual capacities;

 (b)     Free Exercise and Equal Protection § 1983 claims based on denial of an NHI chaplain or inmate minister against Defendant Gastelo in her individual capacity;

 (c)     RLUIPA claim based on denial of NHI banquets against Defendant Allison in her official capacity;

 (d)     Free Exercise and Equal Protection § 1983 claims based on denial of NHI banquets against Defendants Bonnifield, Gastelo, Alderson, Ingwerson, and Steck in their individual capacities;

 (e)     Free Exercise § 1983 claim based on Plaintiff being forced to work on the NHI Sabbath against Defendant Gomez in his individual capacity;

 (f)     RLUIPA claim based on loss or damage to Plaintiff's religious property against Defendant Davidson in his official capacity;

 (g)     Free Exercise § 1983 claim based on loss or damage to Plaintiff's religious property against Defendant Davidson in his individual capacity; and

55

(3)     dismissing all other claims without leave to amend.[16]

DATED:  June 21, 2021                    _Karen E. Scott_____

KAREN E. SCOTT
United States Magistrate Judge

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals but are subject to the right of any party to timely file objections as provided in the Federal Rules of Civil Procedure and the instructions attached to this Report.  This Report and any objections will be reviewed by the District Judge whose initials appear in the case docket number.

---

[16] This would dismiss all claims against Defendants Farao, Alderson's unnamed predecessor, Reynoso, Moloney, and Diaz.

56